UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHRISTINE MARIE ANDREWS,

        Plaintiff,          **No. 6:12-CV-6651(MAT)**

   - vs -                **DECISION AND ORDER**

CAROLYN W. COLVIN, Acting
Commissioner  of Social Security,

        Defendant.
_____

## I.   Introduction

Christine Marie Andrews ("Andrews" or "Plaintiff"), represented by counsel, brings this action pursuant to Title XII of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits ("DIB"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

## II.  Procedural History

Plaintiff protectively filed an application for DIB on January 15, 2010, alleging a disability onset date of May 14, 2009. See T.10, 82, 161.[1] The application was denied, T.83-87, and on August 2, 2011, administrative law judge Brian Kane ("the ALJ")

---
[1] Numbers preceded by "T." refer to pages from the administrative record, submitted as a separately bound exhibit.

held a hearing at which Plaintiff and her attorney appeared. T.27-75. A vocational expert also testified. On September 21, 2011, the ALJ found Plaintiff not disabled, T.10-22, and this became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review on October 3, 2012. T.1-5. This timely action followed.

## III. Summary of the Administrative Record

### A. Medical Evidence

The bases for Plaintiff's disability claim are chronic back pain, shoulder pain, migraine headaches, anxiety, obsessive-compulsive disorder, right tennis elbow, and difficulty focusing and multi-tasking. T.208. Plaintiff has a history of injuries to her right shoulder including dislocations in January of 1999, and January of 2005, for which she was successfully treated with physical therapy ("PT"). T.285-87, 298-301, 320.

With regard to her back pain, x-rays of her lumbar spine on June 3, 2009, showed loss of disc space at L3-L5 and findings consistent with degenerative spondylosis. T.328. Magnetic resonance imaging (MRI) of her lumbar spine on June 15, 2009, revealed mild degenerative changes most prominent at L5-S1, a posterior central disc herniation protrusion with an associated annular tear, and moderate spinal stenosis with mild bilateral neural foraminal narrowing. T.327. Plaintiff treated with orthopedist Rajeev Patel, M.D., who diagnosed a worsening displaced lumbar inverted disc.

Dr. Patel recommended PT and home exercise and instructed her to avoid repetitive or unnecessary bending, twisting, and lifting of heavy objects. At Dr. Patel's recommendation, Plaintiff pursued selective nerve root sleeve injections but declined a surgical consultation. See T.314-15. For her back pain and shoulder pain, Plaintiff was prescribed gabapentin and meloxicam. T.312-13. Plaintiff also saw a chiropractor at various times throughout the relevant period. E.g., T.440.

After a fall off an air mattress on September 5, 2009, that resulted in an injury to her left shoulder, Plaintiff underwent an MRI of that shoulder on December 4, 2009. The MRI revealed no evidence of a rotator cuff tear, with only mild insertional infraspinatus and supraspinatus tendinopathy, and a complex tear of the anterior inferior labrum with extension of the tear superiorly. T.283. Orthopedic surgeon William Ciszewski, M.D. scheduled Plaintiff for surgery to repair the shoulder.

Plaintiff attended 6 appointments for PT on her left shoulder with Sarah Lipinski ("Lipinski") at Genesee Valley Physical Therapy and Sports Rehab from December 22, 2009, through February 2, 2010. See T.288-93. On February 19, 2010, Lipinski completed a medical questionnaire at the request of the Commissioner, indicating a diagnosis of left shoulder Bankart lesion with left shoulder pain and limited mobility and strength. Lipinski noted that Plaintiff was scheduled for surgery on February 11, 2010, and PT was expected

to last 4 to 5 months after the surgery with a fair to good prognosis. Lipinski assessed that Plaintiff was capable of sitting, standing, and/or walking for up to 6 hours each per workday, with no pushing or pulling using the left shoulder, and no lifting or carrying with the left arm. See T.292-94.

On February 11, 2010, Plaintiff underwent surgery on her left shoulder. T.304-06. Dr. Ciszewski found evidence of shoulder impingement and adhesive capsulitis. Plaintiff was in stable condition after the surgery, and returned to PT from March 1, 2010, through October 26, 2010. T.389-424. PT treatment notes indicate improvement in Plaintiff's range of motion and pain over time. See, e.g., T.391, 394, 398, 408, 421.

About 3 weeks after her shoulder surgery, Plaintiff was examined on March 5, 2010, by consultative physician Sandra Boehlert, M.D.. T.331-34. On examination, Plaintiff's left shoulder forward elevation, abduction, adduction, internal rotation, and external rotation were limited to varying degrees. T.333. Plaintiff experienced marked tenderness in the left shoulder with any further range of motion. T.333. Dr. Boehlert's diagnosis was status post-surgical repair of left shoulder impingement syndrome; history of repetitive dislocation in the right shoulder (likely ligamentous loosening); history of high cholesterol; history of migraine headaches; and a psychiatric disorder. T.333. Dr. Boehlert opined that Plaintiff's prognosis was "fair" and that she had a "moderate"

limitation in any heavy lifting or repetitive use of the left shoulder; and an "acute marked" limitation in any use of the left hand or left arm for any lifting or repetitive use. T.333. However, she was expected to improve to "moderate" limitations over time. Id.

Also on March 5, 2010, Lynn Lambert, D. Psy., performed a consultative psychological examination of Plaintiff. See T.336-42. Plaintiff reported no history of mental health treatment, but said that she had discussed anxiety with her primary care physician who had been prescribing anti-anxiety medication for at least 3 years. Dr. Lambert noted that Plaintiff appeared "resistant, despite . . . being bright, to obtaining any mental health treatment," T.336. Due to at times grandiose and expansive thought processes, Plaintiff was likely to have problems concentrating and completing tasks. Plaintiff reported that her mind raced at night, which woke her up at least 3 to 4 times per night. T.338.

Plaintiff stated that she spent her days "involved in graphic design or photography/animated gift [sic] creations for many hours on the computer, not sleeping well so going back to bed during two hours in the middle of the afternoon[;] doing physical therapy . . . and trying to watch soap operas. . . ." T.340. Plaintiff reported

a good and supportive relationship with her husband and son. T.339.[2]

While Plaintiff did not report any manic symptoms, these were "very observable in the areas of occasional grandiosity, excessive talking, pressured speech, distractibility, psychomotor agitation, excessive involvement in pleasurable activities (such as graphic design involvements on the computer for up to 8 to 12 hours daily, including currently), flight of ideas, and occasional unstable mood patterns." Id. Dr. Lambert described Plaintiff's thought processes as coherent, "yet definitely not always goal directed due to very tangential and even loosely associated through processes, consistently following anxiety or mood acceleration (as opposed to related to thought disorder)." T.337; see also T.339 (episodes of disorganization and not finishing tasks "tend to follow accelerated thoughts and moods"). Although Plaintiff was "above average in intellect[,]" her recent and remote memory skills were "[i]mpaired due to affective anxiety and occasional racing thoughts and distractibility." T.339. Her judgment "[f]luctuated between good and poor" and was "overall fair." Id.

Dr. Lambert's main diagnosis was "[b]ipolar I disorder, predominantly manic or hypomanic, most recent episode manic/hypomanic." T.340. Her findings were "consistent with

---

[2]

Prior to administrative hearing, Plaintiff separated from her husband.

moderate to at times severe psychiatric symptom patterns which would compromise functioning." Id. Dr. Lambert opined that Plaintiff "is likely to be moderately challenged to maintain adequate short term memory, maintain adequate focus without high levels of distraction, maintain a regular schedule, perform complex tasks independently, and appropriately deal with stress. . . ." Id. Dr. Lambert gave a prognosis of "fair, despite apparent severity of untreated and current serious psychiatric symptom patterns. . . ." T.341. Dr. Lambert recommended that Plaintiff should "seriously consider formal psychiatric intervention" and "encourage[d] [her primary care physician] to take a strong stance in referring [her] for psychiatric treatment." T.340-41.

On June 22, 2010, Plaintiff returned to Dr. Ciszewski and complained of right buttock pain that had been ongoing for several weeks, numbness that radiated into her right lower extremity, and ongoing left shoulder pain. T.430. Dr. Ciszewski's impressions included right hip discomfort that could be referred pain from Plaintiff's spinal stenosis and spondylosis. T.430. He recommended continued PT for the left shoulder, though he did not anticipate complete recovery. Dr. Ciszewski opined that Plaintiff was unable to work due to her multiple orthopedic conditions. T.430.

On August 3, 2010, Plaintiff saw Dr. Patel who performed bilateral intramuscular trigger point injection of the trapezius for myofascial pain syndrome and bilateral occipital nerve

injections for occipital neuralgia. T.450. On August 9 and August 23, 2010, Plaintiff underwent bilateral therapeutic lumbar selective nerve root injections at the S1level for lumbar radiculitis. T.448, 444.

On August 17, 2010, Plaintiff returned to see Dr. Ciszewski and complained of continued discomfort in her left shoulder. T.427. Upon examination, Plaintiff's left shoulder was swollen, her grip strength was reduced, and range of motion was reduced to 120 degrees in forward flexion, and 30 degrees in external rotation. T.427. Dr. Ciszewski continued her PT for another 4 weeks. Id.

On November 17, 2010, Plaintiff treated with chiropractor Fred L. SanFelipo, D.C., and complained of recurrent lower and upper back pain and neck pain. T.436. Dr. SanFilipo observed that Plaintiff had difficulty with transfer; she walked with a slight, forward flexed antalgic lean; and she exhibited palpable tenderness at the lower lumbar spinaparavertebral musculature. T.436. His diagnosis was mechanical back pain, probably emanating from the joint of the lower lumbar spine. Id. Dr. SanFilipo prescribed flexion/distraction exercises followed by gentle mobilization procedures of the lumbar spine, and myofascial release technique. T.436.

Plaintiff was referred to Donna Ferrero, M.D. on December 6, 2010, to whom she reported worsening chronic neck pain for years. T.477. Dr. Ferrero noted a possible diagnosis of fibromyalgia and

prescribed Lyrica, which Plaintiff declined due to concerns about drug allergies and side effects. Plaintiff returned to Dr. Ferrero on March 10, 2011, at which time Dr. Ferrero repeated her impression that Plaintiff's chronic pain was due to fibromyalgia. T.475. Dr. Ferrero recommended aquatic therapy.

About a year after Dr. Lambert strongly recommended that Plaintiff seek psychiatric treatment, Plaintiff began seeing Anne K. Woods, LCSW-R ("Woods") in 2011, for talk therapy. Plaintiff explained that she had been dealing with multiple stressors and losses, and reported feeling numb, nervous, and "unreal". T.479. Woods planned to conduct cognitive behavioral talk therapy focused on increasing symptom management and coping with stress and loss. Her diagnosis was anxiety disorder, not otherwise specified ("NOS"). T.480. On July 8, 2011, Woods wrote a letter indicating that she had treated Plaintiff five times since starting talk therapy on April 8, 2011, and that she last treated Plaintiff on June 27, 2011. Woods opined that Plaintiff had anxiety and depression, but she considered them disabling only "as an exacerbation of her physical issues." T.481.

On August 12, 2011, Plaintiff's primary care physician John Buckley, M.D. completed a Fibromyalgia Residual Functional Capacity Questionnaire at the Commissioner's request. T.484-87. Dr. Buckley, who had treated Plaintiff for 10 years, stated that she met the American College of Rheumatology criteria for fibromyalgia. T.484.

Her symptoms included multiple tender points, non-restorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, frequent, severe headaches, numbness and tingling, and anxiety. T.484. He noted that Plaintiff was not a malingerer and that she had bilateral pain in the lumbosacral spine; cervical spine; shoulders; arms; hands and fingers; hips; legs; and knees, ankles, and feet. T.485. Plaintiff's pain was present on a daily basis and was exacerbated by changing weather, movement/overuse, and static positions. Id. According to Dr. Buckley, Plaintiff could walk 2 blocks at a time; sit for 30 minutes at a time; stand for 30 minutes at a time; and sit and stand for about 4 hours each in an 8-hour workday. Id. Plaintiff would need to include 5-minute periods of walking around every 30 minutes during an 8-hour workday, and would need a job that permitted shifting at will from sitting, standing, or walking. In his opinion, Plaintiff could occasionally lift 10 pounds; and occasionally twist, stoop, crouch/squat, climb ladders, and climb stairs. T.487. Dr. Buckley opined that Plaintiff's impairments would likely produce "good days" and "bad days" and would likely result in about 3 absences from work per month due to pain symptoms. Id.

**B.  Non-Medical Evidence**

Plaintiff completed 4 years of college, T.209, and was 43 years old as of her alleged May 14, 2009 onset of disability

date. T.204. Plaintiff had past relevant work as a graphic designer, a computer operator, a teacher's aide, and a sales clerk at the Garden Factory. <u>See</u> T.20, 192-97, 210, 237-44. During 2011, Plaintiff worked 4 hours a week teaching art to senior citizens and 2 hours as a substitute teacher in the public school system; however, this work did not rise to the level of substantial gainful activity ("SGA") under 20 C.F.R. 404.1574. T.12.

C.   **Vocational Evidence**

Julie Andrews, Ph.D., an impartial vocational expert ("the VE"), testified that Plaintiff had past work experience as a sales clerk, a graphic designer, a teacher's aide category II, and a computer operator. The ALJ asked the VE to consider a hypothetical individual of the same age, education, and work experience as the Plaintiff who could lift and carry up to 20 pounds, sit for up to 6 hours, stand/walk for up to 2 hours, could infrequently reach above shoulder level, and would need to avoid concentrated or excessive exposure to environmental irritants and extremes in temperature and humidity. The VE testified that such an individual could perform work as a graphic designer or as a computer operator, as Plaintiff had formerly performed that work. T.69-70.

The ALJ also asked the VE to consider a hypothetical with the additional restrictions of being able to stand or walk for 1 hour each during a workday, and being off-task about 10 percent of the day. The VE testified that such an individual could perform  work

in the national and local economies, giving as representative positions that of food checker and telephone solicitor. T.70-72.

Plaintiff's attorney posed hypotheticals to the VE regarding a person who was off-task 20 percent of the day or who would miss 2 days of work per month, and the VE testified that such a person would not be able to return to her past relevant work or obtain any other type of SGA. T.73.

## IV. Legal Principles

### A. Standard of Review

The Commissioner's decision that a claimant is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); see also, e.g., Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). "[I]t is not the function of a reviewing court to decide de novo whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the district court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

However, the district court must independently determine whether the Commissioner's decision applied the correct legal standards in determining that the claimant was not disabled. Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standards is grounds for reversal.").

**B.   Five-Step Sequential Evaluation**

To be considered disabled within the meaning of the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore, the claimant's physical or mental impairments must be of such severity as to prevent engagement in any kind of substantial gainful work which exists in the national economy. Id., § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner follows the five-step analysis set forth in the Social Security Administration Regulations. 20 C.F.R. § 404.1520; see also, e.g., Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). The burden of proof lies with the claimant on steps one through four to show that her impairment or combination of impairments prevents a return to previous employment. Berry, 675 F.2d at 467. If the claimant meets that burden, the Commissioner bears the

burden at step five of establishing, with specific reference to the medical evidence, that the claimant's impairment or combination of impairments is not of such severity as to prevent her from performing work that is available in the national economy. Id.; 42 U.S.C. § 423(d)(2)(A); see also, e.g., White v. Secretary of Health and Human Servs., 910 F.2d 64, 65 (2d Cir. 1990). In making the required showing at step five, the ALJ must consider the claimant's residual functional capacity, along with other vocational factors such as age, education, past work experience, and transferability of skills. 20 C.F.R. § 404.1520(f); see also, e.g., State of N.Y. v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990).

## IV. The ALJ's Decision

### A. Step One

The ALJ found at step one of the sequential evaluation that Plaintiff had not engaged in SGA since May 14, 2009, the alleged onset date. T.12.

### B. Step Two

At the second step, the ALJ found Plaintiff had the following severe impairments: fibromyalgia; a history of dislocations of her right shoulder; a complex tear of the right labrum, status post-surgery; and anxiety disorder, NOS. T.12 (citing 20 C.F.R. §§ 404.1520(c), 404.1521 (an impairment is severe if it significantly limits the claimant's ability to perform work related activities)).

### C.  Step Three

At the third step, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled the criteria of an impairment contained in the listed impairments in 20 C.F.R. Part ("Pt.") 404, Subpart ("Subpt.") P, Appendix ("App.") 1 ("the Listings"). Specifically, the ALJ analyzed Listings 1.02 (Major dysfunction of a joint), 1.04 (Disorders of the spine), and 12.06 (Anxiety related disorders). See T.13-15.

Listing 1.02 requires either an inability to ambulate effectively (Listing 1.02A), or an inability to perform fine and gross movements effectively (Listing 1.02B). The ALJ stated that "[t]reating and examining physicians noted that [Plaintiff] had a normal gait", T.13 (citations omitted); that Plaintiff exhibited no persistent motor, sensory, or reflex deficits, id. (citations omitted); that clinical, laboratory, and diagnostic studies related to Plaintiff's physical complaints "d[id] not approach any requisite levels in the Listings," and no "treating or examining physician ha[d] mentioned findings equivalent in severity to the criteria of any listed impairment." T.21.

Listing 1.04 requires either motor loss accompanied by sensory or reflex loss (Listing 1.04A), or spinal arachnoiditis (Listing 1.04B), or an inability to ambulate effectively (Listing 1.04C). As noted above, the ALJ found that Plaintiff had a normal gait and

exhibited no persistent motor, sensory, or reflex deficits, and there was no evidence of a diagnosis of spinal arachnoiditis.

To meet or medically equal Listing 12.06, Plaintiff's anxiety related disorder must be characterized by at least a "marked" degree of limitation in at least two of the three "paragraph B" criteria (restrictions in activities of daily living ("ADLs"); difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace); or at least a "marked" degree of limitation in one of the "paragraph B" criteria and repeated episodes of decompensation. See 20 C.F.R. § 404.1520a(d)(2); Pt. 404, Subpt. P, App. 1, Sec. 12.06(B). In the alternative, Plaintiff can satisfy Listing 12.06 by meeting the requirements of paragraph C, which encompasses anxiety "[r]esulting in complete inability to function independently outside the area of one's home." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 12.06(C).

The ALJ found that Plaintiff's mental impairment did not satisfy Listing 12.06(B). T.14-15. Specifically, considering the "paragraph B" criteria, the ALJ found that Plaintiff was only "moderately" restricted in her ADLs. T.14 (citing T.47-49, 227-30, 332, 371, 438). Plaintiff testified that she can cook, clean, do laundry, garden, shop, and provide childcare for her son, but needs some modifications or help due to her physical impairments. T.14 (citing 4E-5E, 8F, 18F-19F, and "testimony").

The ALJ found that Plaintiff had only "mild" difficulties with social functioning. T.14. As the ALJ found, Plaintiff has stated that her social life is "normal"; that she visits with friends and family 1 to 2 times a week in person and 3 to 4 times a week via the computer; that she occasionally attends social events in the community; and that she regularly performs volunteer work in connection with her son's activities. T.14 (citing 4E, 9F, 8F; other citations omitted).

With regard to maintaining concentration, persistence, and pace, the ALJ found that Plaintiff "has made inconsistent statements[,]" but "[c]onsidering the evidence as a whole," she has "mild difficulties" in this area. T.14. The ALJ characterized Plaintiff's "[m]ental status examinations" as "reveal[ing] that her concentration and attention were generally intact, but she was distracted at times[.]" T.15 (citing Exs. 9F, 23F). The Court finds that this is not an accurate reflection of the record of Plaintiff's mental status examinations, as consulting psychologist Dr. Lambert found that Plaintiff's recent and remote memory skills were impaired due to affective anxiety and occasional racing thoughts and distractibility. T.339. Dr. Lambert noted that Plaintiff could only recall 2 of 3 objects after 5 minutes, and was only able to perform some of the digit-recitation exercises successfully, despite being of above-average intellect. Id. Based on Dr. Lambert's clinical findings, a finding of only "mild"

impairment in concentration, persistence, and pace is not supported by substantial evidence.

Based on Dr. Lambert's detailed clinical findings, a finding of only "mild" impairment in concentration, persistence, and pace is not supported by substantial evidence. However, this error is harmless, because even if Plaintiff's impairment in concentration, persistence, and pace were described as "moderate" or even "marked", it would not change the Commissioner's determination. That is, Plaintiff still would not be able to meeting the elements of Listing 12.06(B) because she does not have a sufficient degree of impairment in the remaining paragraph B criteria. See Ryan v. Astrue, 650 F. Supp.2d 207, 217 (N.D.N.Y. 2009) ("Other courts have found harmless error where the ALJ failed to afford weight to a treating physician when an analysis of weight by the ALJ would not have affected the outcome.") (citing, inter alia, Walzer v. Chater, No. 93 Civ. 6240 (LAK), 1995 WL 791963, at *9 (S.D.N.Y. Sept. 26, 1995) ("[T]he ALJ's failure to [discuss a report completed by Plaintiff's treating physician] was harmless error, since his written consideration of [the] report would not have changed the outcome of the ALJ's decision.")).

Finally, the ALJ found, there was no evidence of any episodes of decompensation to satisfy Listing 12.06. Plaintiff had never been hospitalized, and up until 2011, had never sought outpatient mental health treatment.

The ALJ determined, in the alternative, that the requirements
of paragraph C of Listing 12.06 were not met because Plaintiff is
able to function outside of the house independently.

After determining that Plaintiff's impairments did not singly
or in combination meet or medically equal a listed impairment, the
ALJ turned to an analysis of Plaintiff's residual functional
capacity ("RFC"), that is, what she can still do despite the
limitations imposed by her impairments. 20 C.F.R. §§ 404.1520(e),
404.1545(a). The ALJ found that Plaintiff retained the RFC to lift
and carry up to 20 pounds, sit for up to 6 hours in an 8-hour
workday, stand and walk up to one hour each during an 8-hour
workday,[3] and infrequently reach above shoulder level with either
arm, although she must avoid concentrated exposure to irritants
such as, dust, odors, fumes, and extremes of temperature and
humidity. In addition, the ALJ found, Plaintiff would be off-task
10 percent of the workday. T.15; see also T.16 (citing T.289-93,
332-33, 371, 388, 421, 425-26, 438, 478). As discussed further
below, Plaintiff contends that the ALJ erred in several respects in

_____

[3]

    Thus, the ALJ found that Plaintiff has the capacity to do
light work with some postural limitations. As defined by the
regulations, light work "involves lifting no more than 20 pounds at
a time with frequent lifting or carrying of objects weighing up to
10 pounds . . . . [A] job is in this category when it requires a
good deal of walking or standing, or when it involves sitting most
of the time with some pushing and pulling of arm or leg controls."
Light work often involves standing on and off, for a total of
approximately 6 hours of an 8-hour workday. 20 C.F.R.
§ 404.1567(b); see also SSR 83-10.

assessing her RFC, including failing to ascribe controlling weight to Dr. Buckley's fibromyalgia report.

**D.    Step Four**

At step four, the ALJ determined that Plaintiff is capable of performing her past relevant work as a graphic designer (Dictionary of Occupational Titles ("DOT") #141.061-018), which is a skilled (SVP of 7) sedentary job that does not require performance of work-related activities precluded by her RFC. T.20 (citing 20 C.F.R. § 404.1565). The ALJ noted that the job of graphic designer requires siting at a computer and does not require carrying more than 20 pounds, and requires sitting for about 6 hours and walking for about 2 hours, in combination. Id. As the ALJ observed, Plaintiff admitted at the hearing that the job does not require reaching above shoulder level. The VE testified that an individual could be off-task 10 percent of the workday and still perform the job of graphic designer. Finding the VE's testimony consistent with Plaintiff's testimony and the information provided in the DOT, and the ALJ accepted the it in accordance with SSR 00-4P. Id.

**E.    Step Five**

The ALJ determined at step five that, considering Plaintiff's age, education, work experience, and RFC, she has acquired work skills from her past relevant work that are transferable to other occupations with positions existing in significant numbers in the national economy. T.21 (citations omitted). The ALJ relied on the

VE's testimony about several representative occupations Plaintiff could perform (food checker, semi-skilled and sedentary; and telephone solicitor, semi-skilled and sedentary) with positions nationally and in the Finger Lakes region of New York. T.21. Although Plaintiff cannot perform the full range of light work, due to the limitations imposed by her impairments, the ALJ found that a finding of "not disabled" was appropriate in light of her age, education, and transferable work skills. T.22 (citing Medical-Vocational Rule 202.22).

## V.    Plaintiff's Contentions

Plaintiff contends that (1) the ALJ's RFC assessment is unsupported by substantial evidence because he erred in evaluating the opinion of treating physician Dr. Buckley; (2) the ALJ's credibility determination is unsupported by substantial evidence because he erred in analyzing the required factors; and (3) the ALJ erred at step four by posing an incomplete hypothetical question to the VE. The Court sua sponte finds that the ALJ committed an additional error at step two by accepting the diagnosis and treatment notes of a social worker over those of the consultative psychologist.

### A.    Error in Determining Under Which Listing to Analyze Plaintiff's Mental Impairments

The ALJ ignored the diagnosis given by consultative psychologist Dr. Lambert of "[b]ipolar I disorder, predominantly manic or hypomanic, most recent episode manic/hypomanic." T.340.

Instead, the ALJ elected to use the diagnosis of "anxiety disorder, NOS" provided by Plaintiff's therapist, Woods, a licensed clinical social worker. Under the applicable regulations, a licensed clinical social worker's opinion is not considered a "medical opinion". Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995) (the regulations provide that "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity" of a claimant's impairments) (citing 20 C.F.R. § 404.1527(a)(2)). Section 404.1513(a) lists five categories of "acceptable medical sources," none of which mentions therapists or social workers. Rather, therapists are expressly listed in a separate section, under "other sources" whose "[i]nformation . . . may . . . help [the Commissioner] to understand how [the] impairment affects [the claimant's] ability to work." Id. (citing 20 C.F.R. § 404.1513(e)).

Dr. Lambert's diagnosis was supported by detailed clinical findings, and is consistent with observations made by Plaintiff's other treating sources and her own reported symptoms. Woods' diagnosis, in contrast, was conclusory. The ALJ therefore erred in rejecting the well-supported diagnosis from Dr. Lambert, an acceptable medical source, and opting to use the diagnosis given by Woods. Had the ALJ properly accepted Dr. Lambert's diagnosis, the

appropriate listed impairment to use was Listing 12.04 (Affective disorders).[4]

After reviewing the entire record, the Court must conclude that this error nevertheless was harmless because Plaintiff cannot meet the "paragraph B" criteria of Listing 12.04. In addition to a diagnosis of bipolar disorder, Plaintiff would have had to demonstrate at least two of the following: marked restriction of ADLS; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B)(1)-(4). As noted above, the ALJ found that Plaintiff had "mild" difficulties in social functioning and "moderate" difficulties in ADLs. These findings are supported by substantial evidence; indeed, the record does not support a finding of "marked" difficulties in either of these areas.

With regard to concentration, persistence, and pace, the ALJ found that she has "mild difficulties" in this area. T.14. As discussed above, this finding is not supported by substantial

_____

      4
      Listing 12.04 deals with "affective disorders" which are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. "Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)" can fulfill the first component ("paragraph A criteria") of Listing 12.04. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(A)(3).

evidence, in light of consultative psychologist Dr. Lambert's report. As with the ALJ's error in the analysis under Listing 12.06, the Court must conclude that this error is harmless, because even if Plaintiff's impairment in concentration, persistence, and pace were described as "moderate" or even "marked", Plaintiff still would not be able to meeting the elements of Listing 12.04(B) because she does not have a sufficient degree of impairment in the remaining paragraph B criteria. See, e.g., Ryan v. Astrue, 650 F. Supp.2d at 217.

**B.    Error in Applying the Treating Physician Rule**

The ALJ did not afford "any *significant* weight," T.18 (emphasis in original) to Dr. Buckley's opinion" that Plaintiff would miss about 3 days per month from work due to her impairments or treatment for those impairments, finding it "not fully consistent with the medical evidence of record" and Plaintiff's own testimony. T.18 (citing Ex. 1F (T.274-81)). Dr. Buckley is Plaintiff's primary care physician, and had been treating Plaintiff for 10 years at the time he completed his fibromyalgia report (T.484-87).

Under the "treating physician's rule," the ALJ must give controlling weight to the treating physician's opinion when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R.

§ 404.1527(d)(2). "Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician," <u>Halloran v. Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted), "the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record. . . ." <u>Id.</u> (citing <u>Veino v. Barnhart</u>, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 404.1527(d)(2)).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." <u>Halloran</u>, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the evidence in support of the treating physician's opinion and the consistency of the opinion with the record as a whole. <u>Id.</u> The regulations also specify that the Commissioner "will always give good reasons" for the weight given to the treating source's opinion." <u>Id.</u>

Applying these regulations and principles, the Court concludes that the ALJ adequately considered Dr. Buckley's opinion that Plaintiff would miss 3 days of work per month due to her impairments or medical appointments, and explained its inconsistency "with the record as a whole." 20 C.F.R. § 404.1527(d)(4). The ALJ's finding that there was "nothing in the record to suggest" that Plaintiff would miss that many days of work

is not clearly erroneous as Plaintiff reported "that she has never missed time from work due to her impairments[,]" T.18 (citing Ex. 1F), and she was presently "working at a part-time, sedentary job [i.e., teaching a seniors' art class and substitute teaching] with no reported problems[,]" id., in attendance.

However, the ALJ erroneously rejected Dr. Buckley's estimation regarding the appropriate lifting restrictions for Plaintiff. The ALJ cited a statement Plaintiff allegedly made to her orthopedic surgeon in September 2010, that she "can lift heavy weight but it gives extra pain". T.15 (citing Ex. 15F (T.371-87)). This statement was simply a pre-printed answer checked off on the Oswestry Low Back Disability Questionnaire; it was not Plaintiff's description of her abilities in her own words. In November 2010, she completed the Oswestry Low Back Disability Questionnaire again and indicated that pain prevented her from lifting heavy weights. The ALJ deemed these statements inconsistent, but they both convey essentially the same thing–that lifting heavy weights is contraindicated because doing so causes Plaintiff to suffer increased pain. Furthermore, the ALJ neglected to mention that on September 20, 2010, Plaintiff's orthopedist, Dr. Patel, advised her to avoid lifting heavy weights. T.447. In addition, consultative physician Dr. Boehlert stated that even after Plaintiff's left shoulder healed from her surgery, she would have moderate limitations in repetitive use of her left shoulder and in heavy lifting. The ALJ

declined to give this aspect Dr. Boehlert's opinion "great weight" because she was "estimating the claimant's future limitations without any evidence to support it." However, Dr. Boehlert was not engaging in impermissible speculation but was making a prognosis, i.e., a physician's forecast of the probable course and outcome of a patient's disorder. See, e.g., Dorland's Medical Dictionary for Health Consumers (2007). Indeed, the reports filled out by consultative examiners for the Administration always contain a section headed, "Prognosis".

To the extent that the ALJ determined that Plaintiff could lift and carry up to 20 pounds during the workday, the Court finds that this is a product of a legal error in that it reflects a failure to properly apply the treating physician rule, and it is likewise unsupported by substantial evidence. Dr. Buckley's opinion regarding Plaintiff's limitations in her ability to lift is consistent with the substantial medical and testimonial evidence of record, which indicate that Plaintiff only can lift up to 10 pounds. This aspect of the ALJ's RFC cannot stand.

## C.   Erroneous Credibility Determination

Plaintiff contends that the ALJ's credibility determination is unsupported by substantial evidence because the ALJ erred in analyzing the required factors when assessing her credibility. As Plaintiff notes, objective medical evidence is used to establish the existence of an impairment which "could reasonably be expected

to produce the pain or other symptoms alleged." 42 U.S.C. § 423(d)(5)(A). Once the ALJ has found such an underlying medically determinable impairment, he is required to evaluate the intensity and persistence of the claimant's symptoms. See 20 C.F.R. §§ 404.1529(c)(1). In doing so, several factors must be considered, including the claimant's daily activities and the location, duration, frequency, and intensity of pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3); see also Social Security Ruling ("SSR") 96-7p.

First, in regards to Plaintiff's activities of daily living, the ALJ stated that Plaintiff "cooks, cleans, washes, [does] laundry, shops and does some gardening." T.17. Plaintiff asserts that the ALJ failed to consider Plaintiff's testimony that she only dusted her home once every month; that her father helps her out around the house a great deal because he has a background in carpentry; and that when she went shopping, she modified her trips so that she would not have to carry much weight all at once. T.48. However, the ALJ is not required to reconcile every piece of conflicting evidence in the record. In addition, there are statements by Plaintiff in the record that support the ALJ's finding. On September 20, 2010, Plaintiff was seen by Dr. Patel in follow-up, see T.371-74, and reported she could take care of herself normally, could stand as long as she wanted, could travel anywhere, and could perform most of her homemaking/job duties,

although these activities increased her pain. On November 15, 2010, Plaintiff returned to Chiropractic Orthopedics and reported her "pain comes and goes and is moderate" and that she "can only do [her] usual work but no more." T.438.

Plaintiff also argues that the ALJ erred is discounting her credibility based on an alleged inconsistency in her testimony regarding the injury to her left shoulder. According to the ALJ, Plaintiff testified at the hearing that "she injured her shoulder in April 2009 while working in the garden shop" but she "told her treating physical therapist that her injury occurred on September 5, 2009, when she fell off an air mattress." T.17. This is an incorrect summary of the record. At the hearing, Plaintiff actually testified that she had not done any long term substitute teaching since she hurt her *back* at the Garden Factory in April of 2009. See T.41. The ALJ's recitation of the facts contained in the credibility assessment must be accurate and contain an explanation why they undermine the credibility of the witness. E.g., Horan v. Astrue, 350 F. App'x 483, 484, 2009 WL 3161379, at *1 (2d Cir. Oct. 2, 2009). However, because there is substantial evidence supporting the remainder of the credibility analysis, the ALJ's misstatement as to when Plaintiff recalled injuring her shoulder is harmless and does not affect the outcome of the case. See Barringer v. Commissioner of Soc. Sec., 358 F. Supp.2d 67, 83 n. 26 (N.D.N.Y. 2005) (noting that an ALJ's incorrect rendition of facts in the

record is nothing more than harmless error where his credibility assessment is amply supported by other substantial evidence); see also Campbell v. Astrue, 713 F. Supp.2d 129, 141 (N.D.N.Y. 2010) (similar).

### D.    Erroneous Reliance on an Incomplete Hypothetical

Plaintiff argues that the ALJ erred at step four by relying on testimony elicited from the VE in response to an incomplete hypothetical question. Plaintiff contends that due to errors in determining her RFC and assessing her credibility, the ALJ's "hypothetical question was an incomplete and inaccurate portrayal of [her] limitations. . . ." Plaintiff's Memorandum of Law at 23 (citing DeLeon v. Secretary of Health and Human Servs., 734 F.2d 930, 936 (2d Cir. 1984). However, Plaintiff does not indicate what additional limitations the ALJ should have included in the hypothetical. The Court interprets Plaintiff's brief as suggesting that the ALJ erred in declining to accept the VE's testimony, in response to a hypothetical posed by her attorney, that a person would not be able to perform any work if, in addition to the limitations contained in the ALJ's RFC determination, she would miss 2 days of work per month or were off-task 20 percent of the workday. T.74. Plaintiff notes that Dr. Buckley opined that Plaintiff would miss 3 days of work per month due to her impairments, and that her pain would be severe enough to constantly

interfere with her ability to maintain the attention and concentration necessary to perform even simple work tasks. T.485.

As noted above, the ALJ determined that Dr. Buckley's opinion regarding Plaintiff's missed work days was unsupported by the record and Plaintiff's own statements about her activities. After reviewing the record, the Court cannot say that this finding is unsupported by substantial evidence for the reasons discussed above. Likewise, Dr. Buckley's opinion that her attention and concentration would be constantly interrupted by pain is contradicted by Plaintiff's own statements. In particular, Plaintiff told consultative psychologist Dr. Lambert that she routinely spends 8 to 12 hours on the computer doing graphic design activities, T.338, which is essentially her past relevant work. Accordingly, the Court cannot find that the Commissioner committed legal error at step four.

## VI. Conclusion

For the foregoing reasons, the Commissioner's finding that Plaintiff can regularly lift up to 20 pounds is reversed because it is not based on substantial evidence and is the product of legal error. Notwithstanding this conclusion, the Court finds that there is substantial evidence in the record to support the Commissioner's findings that Plaintiff's impairments or combination of impairments do not meet or medically equal a listed impairment. In addition, there is substantial evidence in the record to support a finding

that Plaintiff has the RFC to perform sedentary work as defined in the regulations, and that there are jobs in the national and regional economies, including Plaintiff's past relevant work of graphic designer, that she can perform. Accordingly, the Court concurs with the Commissioner's ultimate conclusion that Plaintiff is not disabled within the meaning of the Act, and the remainder of the Commissioner's decision (apart from the lifting restriction) is affirmed.

Plaintiff's motion for judgment on the pleadings (Dkt #12) therefore is granted in part and denied in part. Defendant's motion for judgment on the pleadings (Dkt #9) likewise is granted in part and denied in part. The Clerk of the Court is requested to close this case.

**SO ORDERED.**


**S/Michael A. Telesca**
HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:   October 30, 2013
         Rochester, New York